IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| KAJEET, INC., | § § | |
| Plaintiff, | § § | Case No.: 6:21-cv-704 |
| v. | § § | **JURY TRIAL DEMANDED** |
| INFOWEISE PTY., LTD., | § § § | |
| Defendant. | § § | |

**ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff KAJEET, INC. files this Complaint for Patent Infringement against Defendant INFOWEISE, PTY., LTD., alleging as follows:

**I.  THE PARTIES**

1. KAJEET, INC. ("Plaintiff" or "Kajeet") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 7901 Jones Branch Drive, Suite 350, McLean, Virginia 22102.

2. Defendant INFOWEISE, PTY., LTD. ("Defendant" or "Infoweise") is a foreign company organized under the laws of Australia with a principal place of business at 3/30 Cowper Street, Parramatta, NSW 2150, Australia. Infoweise may be served with process through the Texas Secretary of State.

**II.  JURISDICTION AND VENUE**

3. This is an action for infringement of United States patents under 35 U.S.C. §§ 271, *et seq.* Federal question jurisdiction is conferred to this Court over patent infringement actions under 28 U.S.C. §§ 1331 and 1338(a).

4. Defendant is subject to this Court's specific personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, by virtue of at least their substantial business conducted in this forum, directly and/or through intermediaries, including (i) having solicited business in the State of Texas, transacted business within the State of Texas and attempted to derive financial benefit from residents of the State of Texas, including benefits directly related to the instant patent infringement causes of action set forth herein; (ii) having placed its products and services into the stream of commerce throughout the United States and having been actively engaged in transacting business in Texas and in this District; and (iii) either alone or in conjunction with others, having committed acts of infringement within Texas and in this District.

5. Upon information and belief, Defendant does not maintain a place of business anywhere within the United States. Defendant has sufficient minimum contacts with the Western District of Texas, however, such that this venue is fair and reasonable. Defendant has committed such purposeful acts and/or transactions in this District that it reasonably should know and expect that they could be hailed into this Court as a consequence of such activity. Defendant has transacted and, at the time of the filing of this Complaint, continues to transact business within the Western District of Texas.

6. Further, upon information and belief, Defendant makes or sells products that are and have been used, offered for sale, sold, and/or purchased in the Western District of Texas. Defendant directly and/or through its distribution network, places infringing products or systems within the stream of commerce, which stream is directed at this district, with the knowledge and/or understanding that those products will be sold and/or used in the Western District of Texas.

7.      For these reasons, personal jurisdiction exists, and venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b), respectively.

## III.    BACKGROUND AND FACTS

8.      Kajeet is the owner of all rights and title in and to U.S. Patent No. 8,667,559 ("the '559 Patent" or "the Asserted Patent").  The inventions disclosed and claimed in the Asserted Patent were developed by the founders, entrepreneurs, and engineers of Kajeet and were assigned to Kajeet upon issuance.

9.      Kajeet is a U.S.-based company, founded in 2003, which develops software and hardware solutions promoting safe use of mobile devices by children both at home and in schools and libraries.  Kajeet was founded by three fathers who sought to develop systems and methods ensuring safe use of mobile phones, tablets, computers, and other mobile devices by their children.

10.     Kajeet has become an industry leader in this area of mobile device management, developing innovations that led to the issuance of thirty-eight U.S. patents to date, including the Asserted Patent, and having implemented its solutions in hundreds of school districts comprising thousands of schools across the nation.  These innovations were directly developed by the founders and engineers at Kajeet as part of Kajeet's continuous work to protect children from inappropriate and distracting online content, and to enable schools and families to keep children focused and safe from the many potential dangers associated with unconstrained access to online content.

11.     The disclosure and claims of the Asserted Patent describe improved control schemes implemented on communication devices, focusing on applications in which it is undesirable for the user of the communication device to have unfettered or

unconstrained access to some or all of the available functionality supported by the communication device. See, *e.g.*, the '559 Patent at 1:47-62.[1] A typical scenario addressed by the Asserted Patent is that of a smartphone, tablet, or laptop used by a child. See, *e.g.*, the '559 Patent at 4:11-18; 4:38-44; and, 5:20-29. This is a relatively new problem that has arisen in the past decade as mobile communication devices have become more popular and more widely used throughout society, including in schools and at home by children. See, *e.g.*, the '559 Patent at 1:51-58; 2:10-21; 4:42-58; 6:34-409; 12:48-62; and, 14:13-23.

12. Mobile smartphones appeared in the mid-1990s as Personal Digital Assistants ("PDAs"). These devices expanded the set of features accommodated by handheld mobile communication devices and their appearance coincided with the rise in popularity and use of the World Wide Web. In 2007, Apple released the first iPhone and in 2008 released the App Store. This signaled the beginning of mainstream smartphone ownership and usage and, in particular, ownership and usage of feature-rich smartphone devices by teens and children. Also, during this timeframe, other Internet-capable, mobile computing devices greatly expanded in popularity, including tablet devices, including iPads and Kindles, as well as laptop devices, including the Google Chromebook. Increasingly, these devices are put in the hands of teens and children both by their parents and by schools, giving them ready access which they never had before to inappropriate content, contacts, sexting, online gaming, among other undesirable features and functionality. Further, this new access is cheap, anonymous, and readily-available at any

---

[1] All citations to the '559 Patent, which is attached hereto as Exhibit A, are illustrative rather than exhaustive and therefore do not comprise complete listings of all portions of the specification addressed to each topic for which citations are provided.

time, day or night from virtually anywhere. Parents, as well as school administrators and others, have struggled with addressing this newly created problem ever since.

13. The Asserted Patent is addressed to specific systems and methods for addressing this new problem faced by parents, teachers, business owners, and the like. The Asserted Patent recognizes that old-world methodologies, such as simply taking the devices away, do not truly address the problem at hand and undermine the safety benefit of device ownership – continuous access for communication, such as always providing a direct means for a parent to call its child or vice versa. For device ownership by teens and others to provide this benefit, the device is necessarily in the possession of the teen at times when he or she is *away from* parents, teachers, and the like. Old-world monitoring of device use to preventing inappropriate use is therefore also ineffective and does not address the true context of this new problem in society created by the development and proliferation of feature-rich mobile communication devices.

14. As explained in the specification of the Asserted Patent, prior art systems and methods for controlling mobile communication device usage in such settings were ineffective. For example, prepaid phone plans placed limits on the charges that could be run up on a mobile communication device but did so through toggling access to the communication network off once the account reached a zero balance. Beforehand, access to the communication network may be unconstrained while after, no access is provided whatsoever. This control scheme was ineffective for preventing misuse of the mobile communication device by a child while still providing access to desirable features. See, *e.g.*, the '559 Patent at 2:36-44.

15. Likewise, unlimited use smartphone service plans could prevent the accumulation of excessive usage costs but were ineffective to prevent overuse or use of a mobile communication device at inappropriate times or to access inappropriate content. See, *e.g.*, the '559 Patent at 3:7-16.

16. Other solutions involving control through enforcement of decisions based upon policies defining permitted use that were set and stored only in accessible portions of the memory of the device itself, such as in the volatile memory of the device. These solutions were likewise ineffective as the policies upon which decisions effecting control were vulnerable to manipulation or deletion by virtue of their only being stored in accessible portions of memory of the computing device. Further, such solutions required separate and independent configuration of each computing device to be controlled, resulting in increased administrative costs.

17. The '559 Patent states that the systems and methods disclosed therein "are effective tools for any phone user that requires some level of supervision, such as a handicapped individual, a person suffering from dementia, a corporate employee, or even an adult that has shown poor judgment in the past and needs help managing their affairs." '559 Patent at 5:34-41. The '559 Patent also states that:

> The ability to regulate **when a phone can be and cannot be used can also be of value to parents and school districts** with respect to resolving one of the greatest conflicts that exist between parents/students and school administrators - mobile phone usage by kids. Parents want children to have a mobile phone with them so the child can call the parent if need be, i.e., if someone forgets to pick the child up after school. School districts do not want the children to have the phones at all **because the students tend to misuse the phones, i.e., to call friends during school, to cheat, to engage in illegal activity, etc**. While the school districts believe that children should be relegated to only using the school phones if the children need to contact a parent, the parents

      want the children to have the phones with them in case they get locked out of the school, get lost on a field trip, etc. '559 Patent at 12:48-62 (emphasis added).

The Asserted Patent therefore recognizes that it is advantageous to dispose the policies applied for effecting feature management over communication devices in accordance with a scheme that prevents access to them by the user of the device, who may have poor judgment or be motivated to otherwise misuse the communication device.

      18.    The specification the Asserted Patent discloses, among other innovations, systems and methods for providing access to desirable features, such as always allowing for calls to a parent, for example, while also preventing access to features deemed inappropriate because of cost (e.g., downloadable games or other applications), type of content (e.g., gambling or pornographic content), the time of day or night (e.g., during school hours or after bed time), and/or the device's location, among other criteria.  See, *e.g.*, the '559 Patent at 3:54-59; 4:11-18; 5:45-50; 13:8-28; and; Claims. The Asserted Patent discloses control embodiments applying decisions based upon policies defining acceptable and unacceptable uses of a mobile communication device.  The policies may be based on a variety of contexts which are set by administrators (e.g., parents or teachers).  In accordance with certain embodiments of the inventions disclosed, the policies are set and stored at the server level to provide simultaneous control over use of one or more mobile communication devices.  See, *e.g.*, the '559 Patent at embodiment of Fig. 2; 3:54-59; 4:11-18; 5:45-50; 13:8-28; and; Claims. The intrinsic record states this at Office Action Response dated October 17, 2013 filed during prosecution of the '559 Patent at p. 10 (distinguishing a particular embodiment claimed therein on the basis that the prior art "does not describe a ***distributed architecture where policy decisions are***

7

*performed at the server level* and those policies are enforced on the phone itself.")(emphasis added). A true and correct copy of this Office Action Response is attached hereto as Exhibit B and incorporated for all purposes.

19. Application of use decisions based upon a policy stored remote from the controlled computing device represented an unconventional scheme that was neither well known nor routine for addressing a newly emerging problem in society. Embodiments of the inventions disclosed and claimed in the Asserted Patent implementing this unconventional scheme provide for more robust control that was more resilient to manipulation and/or disablement by users of the controlled devices and, therefore, more effective than prior art systems and methods.

20. Infoweise is a software developer of solutions accommodating feature management of computing devices configured for operation on communication networks, including laptops, tablets, smartphones, and the like. Each comprises a computing device usable to access online content and applications over a communication network managed by a service provider, such as an internet service provider (ISP).

21. The Accused Products of Infoweise include all versions and releases of SecureTeen Premium and Premium Plus mobile applications. Upon information and belief, each of these Accused Products comprise substantially similar features, functionality, and operation, accommodating management of mobile communication devices accessing content over communication networks via application of settings remotely configured by administrators (i.e., parents).

22. The Accused Products comprise a system of hardware (Infoweise servers) and software (the SecureTeen mobile application) implementable on computing devices to provide "comprehensive parental control application for your computers and cell phones. It is designed to provide you with easy controls to manage your child's online

activities and to make their web surfing safe. [The Accused Products] also help[] you to block unwanted games & apps, set time schedule for device usage, track location and various controls to protect your kid's device."

23. The Accused Products effect policy-based control over these devices via, among other things, routing traffic to and from the device through the Infoweise servers and the SecureTeen App. Application of said policies defines when and what features and content are accessible on a managed device. The Accused Products accommodate selectively permitting or blocking access to device features, such as mobile applications and screen time, generally, via time-based policies for limiting access to device features in accordance with daily time limits or usage schedules.

24. The Accused Products are marketed as supporting all Android and iphone/iPad models as well as all Windows computers. "They can filter internet, block apps and set rules for bed time, homework time etc. Parents can also remotely monitor SMS, Call details, Location, Whatsapp, Viber, KiK, Line, WeChat, Web history, Facebook Messenger (Android only), Gmail(Android only), Pictures(Android only), Keystrokes(Android only), and Snapchat text chat(Android only)."

25. The Accused Products enforce rules set by administrators through application of master policies set and stored on Infoweise's servers using Infoweise's online dashboard at URL: http://www.secureteen.com/login. The online dashboard is also accessible through a companion Parent App installed on a parent's device.

26. To use the Accused Products, the SecureTeen App must be installed on each device to be managed as well as on an administrator device. Infoweise provides links to download the App through its website and makes the App available on third party app stores.

27. Upon download, the mobile application software requires several permissions to operate on a managed device, including Device Administrator permission, use of Accessibility Service, Wi-Fi Connection information. The Accused Products use

9

Accessibility Service to limit apps usage. The mobile application is operable to receive data from Internet, view network connections, connect and disconnect from Wi-Fi, full network access, run at startup, and prevent device from sleeping.

28. These permissions and functionality allow the Accused Products to intercept and compare all usage requests to policies. The required access and permissions allow for and cause all actions taken and content viewed on a managed device to be routed through one or more servers of Infoweise.

29. Infoweise's servers host its user interface dashboard from which administrators can see all monitored devices and usage. The Accused Products either permit or block requested uses of a managed device in accordance with decisions applying policies set by parents. As such, all decisions are based on a policy stored on Infoweise's servers. Disallowed requests result in a "block screen" on the managed device.

30. Infoweise accommodates Time Usage Limits and Schedules defining daily and weekly maximum time allotments and usage scheduling. Requests for access are blocked once a time limit is met or a scheduled time period is exceeded. The time-based limits define daily maximum time allotments and allowed usage scheduling by profile, application, and/or by device.

31. In operation, devices are named by an administrator and associated to a particular user profile during installation and setup. Policies are then set for a profile via the online dashboard and applied to devices associated to that user profile. The dashboard displays data for all devices associated to a particular profile. Infoweise policies, such as the time-based policies and applications controls are accessible and configurable through an application running on an administrator's mobile device or via Infoweise's online dashboard.

32. Once policies are set, derivatives thereof comprising instructions for enforcement are pushed to the controlled device for application thereon. These

instructions are routinely updated to synchronize them with the operative version of all policies then-set and stored on Infoweise's servers. A determination regarding whether a requested usage of a controlled device is permissible or not is made through application of instructions pushed to the device as well as through application of updates thereto. As such, all usage decisions are based on the operative master policies set and stored on Infoweise's servers.

33. Infoweise provides instructions to its customers and users of the Accused Products demonstrating how to install, set up, and use the Accused Products to manage computing devices. For example, Infoweise provides tutorials on Infoweise's website at URL: https://www.secureteen.com/faq.

34. The weblinks provided on Infoweise's website access Infoweise's software applications for download onto computing devices, provide instructions to users on installation, setup, and configuration of the Accused Products on communication devices, and provide instructions for accessing and modifying policies to be applied to communication devices. Use of the Accused Products in accordance with these instructions provided by Infoweise constitutes direct infringement of the Asserted Patent, either literally or under the doctrine of equivalents, by end users of the Accused Products.

35. On February 27, 2020, Kajeet sent a letter to Infoweise to put Infoweise on notice of the Kajeet patents and alleging infringement of at least the Asserted Patent by Infoweise via its making, using, and selling of the Accused Products. Infoweise did not responded to Kajeet's letter and allegations.

36. Infoweise has had actual knowledge of each of the Asserted Patents since at least February 27, 2020 and, further, has had actual knowledge of Kajeet's claims of infringement relating to the Asserted Patents since that time. Infoweise continues to make, use, and sell the Accused Products despite having been on notice of Kajeet's infringement claims since at least its receipt of the February 27, 2020 correspondence.

## COUNT I
## PATENT INFRINGEMENT
## U.S. Patent No. 8,667,559 B1

37. Kajeet repeats and re-alleges all preceding paragraphs of this Complaint, as though fully set forth herein.

38. On March 4, 2014, United States Patent No. 8,667,559 B1 ("the '559 Patent") was duly and legally issued for "Feature Management of a Communication Device." As of the filing of this Complaint, the '559 Patent remains in force. A true and correct copy of the '559 Patent is attached hereto as Exhibit A and made a part hereof.

39. Kajeet is the owner of all right and title in the '559 Patent, including all rights to enforce and prosecute action for infringement of the '559 Patent and to collect damages for all relevant times against infringers of the '559 Patent. Accordingly, Kajeet possesses the exclusive right and standing to prosecute the present action for infringement of the '559 Patent by Infoweise.

40. The '559 Patent generally discloses and claims systems and methods for controlling computing devices usable on communication networks to perform various functions, such as sending and receiving data over the Internet via one or more servers, for example. The systems and methods accommodate enforcement of decisions granting or denying such requests to use device functions and/or to communicate with remote computing devices over a communication network. The decisions are based on the application of one or more relevant use policies which may be administrator-configurable and may be stored remotely from the controlled computing device. Decisions to grant or deny communication requests made by the controlled device may be made and effectuated in real-time.

41. More specifically, independent claim 13 of the '559 Patent and each dependent claim depending therefrom are directed to "methods for controlling a computing device configured to execute a function using a communication network managed by a service provider." '559 Patent at Claim 13. These claimed systems

explicitly require a computing device configured to "access a decision stored on the computing device, the decision having been received from a server and being based on a policy that is stored at the server and that determines whether the function is permitted to run on the computing device," among other limitations. *Id*.

42. These limitations mandate that the policies applied to effect control over the computing device be stored on a server remote from the computing device. Further, these limitations capture the distributed architecture concept <u>not</u> well-understood, routine, or conventional in the art for effecting feature management on a computing device (including that the server storing the policies is meaningfully apart from the computing device) which resulted in improved operation through at least increased resilience to undesirable accessing of policies by a user of the device to manipulate or delete them.

43. Claim 13 of the '559 Patent and each claim depending therefrom are rooted in control schemes for managing communication devices and require remote storage of usage polices which are thereby less vulnerable to manipulation and deletion by the user of the controlled device(s) while still accommodating real-time control concurrent with device usage. Device management in accordance with these claimed methods improve the functionality of the computer-based system through improved security, effectiveness, and robustness of control accommodated. As such, the claimed methods are directed to patent eligible subject matter.

44. Additionally, when considered as an ordered combination of elements, claim 13 and each claim depending therefrom comprise an "inventive concept" for at least the reasons presented herein and above. These claims require storing policies remotely from the managed devices, an unconventional arrangement at the time which yielded improvements in the operation of systems implementing the claimed methods. The few communication device control systems and methods available at the time of invention of the subject matter claimed relied upon setting and storing policies directly on the device, itself, within accessible portions of the device's memory. As such, these

policies were accessible to users of those devices for manipulation and/or deactivation or deletion, circumventing the control system entirely and requiring that each controlled device be configured separately and individually. The arrangement claimed in claim 13 and its dependent claims of the '559 Patent run counter to what was well-understood, routine, and conventional to one of ordinary skill in the art at the relevant time by requiring remote storage of such policies while effecting real-time control over communication devices and providing other benefits, as noted herein and above.

45. Infoweise has had actual knowledge of the existence of the '559 Patent since at least February 27, 2020 for at least the reasons discussed above. As such, Infoweise's infringement of the '559 Patent has been willful since at least that time.

46. Infoweise, without authority, consent, right, or license, and in direct infringement of the '559 Patent, makes, has made, uses, and sells the Accused Products which practice the method claimed in at least claim 13 of the '559 Patent, among others. By way of example only, Infoweise's quality testing and demonstrations of operation of the Accused Products, including several videos, to manage use of computing devices directly infringe, either literally or under the doctrine of equivalents, at least Claim 13 of the '559 Patent.

47. Infoweise actively induces infringement of one or more of the claims of the '559 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). Use of the Accused Products to manage use of computing devices in the manners described above infringes at least Claim 13 of the '559 Patent. Infoweise makes and sells the Accused Products knowing that they are especially designed for and marketed toward such infringing use by users of these products, such as by parents or supervisors, for use in selectively permitting or denying use of computing device functionality by children. Further, Infoweise provides step-by-step instructions for use of the Accused Products in ways that

infringe, either literally or under the doctrine of equivalents, claims of the '559 Patent in the form of user manuals and online content available through Infoweise's website.

48. Infoweise contributes to the infringement of one or more of the claims of the '559 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). Infoweise makes and sells the Accused Products which are especially designed for use to manage computing devices through the setting and enforcement of remotely stored administrator-configured policies in the manner described above. Policies are set using the SecureTeen App and stored on Infoweise's servers and are implemented through Infoweise hardware and software on managed devices for remote management. As such, the Infoweise software applications and servers comprise material aspects of the system claimed in at least claim 13 of the '559 Patent. Further, upon information and belief, the Accused Products have no substantial non-infringing use, as they are specifically designed and marketed for use by parents in managing use of computing devices used by children. Use by Infoweise's customers of the Accused Products in the manner proscribed by Infoweise constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claim 13 of the '559 Patent.

49. Kajeet expressly reserves the right to assert additional claims of the '559 Patent against Infoweise.

50. Kajeet has been damaged as a result of Infoweise's infringing conduct. Infoweise is, thus, liable to Kajeet in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

51. Based on Infoweise's actual knowledge of the '559 Patent and of Kajeet's allegations of patent infringement which are consistent with those presented herein since at least June 8, 2018, if not earlier, as well as Infoweise's objective recklessness in

continuing to offer for sale and selling the Accused Products since that time, Kajeet is further entitled to enhanced damages under 35 U.S.C. § 284.

## VI.  JURY DEMAND

52. Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that one or more claims of the Asserted Patent have been directly infringed, either literally or under the doctrine of equivalents, by Defendant, or judgment that one or more of the claims of the Asserted Patent have been directly infringed by others and indirectly infringed by Defendant, to the extent Defendant contributed to or induced such direct infringement by others;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, including enhanced damages as permitted by 35 U.S.C. § 284;

c. Judgement that Defendant's infringement is willful from the time Defendant was made aware of the infringing nature of its products and methods and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

d. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein;

d. That the Court declare this an exceptional case and award Plaintiff its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

e. That Defendant, its officers, agents, servants and employees, and those persons in active concert and participation with any of them, be permanently enjoined from infringement of one or more claims of the Asserted Patent or, in the alternative, if the Court finds that an injunction is not warranted, Plaintiff requests an award of post judgment royalty to compensate for future infringement;

g. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

/s/ Corby R. Vowell
Jonathan T. Suder
Michael T. Cooke
Corby R. Vowell
Richard A. Wojcio
FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 200
Fort Worth, TX 76102
817-334-0400
Fax: 817-334-0401
jts@fsclaw.com

mtc@fsclaw.com
vowell@fsclaw.com
wojcio@fsclaw.com

***Attorneys for KAJEET, INC.***